## Papoulas v. West Penn Aviation, Inc., et al.

Before Patterson, P. J., and Weiss, O'Brien and Thompson, JJ.

*Brennan & Brennan,* for plaintiff.

*Dalzell, McFall, Pringle & Bredin,* for defendant.

THOMPSON, J., October 31, 1950.—On the trial of this case defendant at the conclusion of the offering of testimony made a motion for binding instructions in

its favor, which motion was refused. After the case was submitted to the jury, they were unable to agree and were discharged. We now have before us defendants' motion for judgment upon the whole record.

The legal situation is the same as that which confronted the trial judge when he refused the motion for binding instructions. The appellate courts have repeatedly held that under similar circumstances:

"In passing upon the record we must assume the truth of plaintiffs' evidence and consider all favorable inferences that can be drawn therefrom; . . . Such judgment can be entered only where binding instructions should have been given at the trial: Duffy v York Haven Water & Power Co., 233 Pa. 107; Hobel v M. & S. Ry. & Light Co., 233 Pa. 450,": Derrick et al. v Harwood Electric Company, 268 Pa. 136, 140.

Minor plaintiff, Mary Papoulas, was seriously injured in an accident which occurred on the morning of March 31, 1948. She resided with her mother at East Pittsburgh, Pa., and was a very promising student in the East Pittsburgh High School.

During the month of February 1948 she became enrolled as a student under the supervision of defendant company at its airport near Irwin, Westmoreland County. About March 1st she began to take flying instructions as a paying student and had both ground instruction and a total of six hours and twenty minutes actual flight instruction in the air. Defendant, Claud Leroy Edmundson, was her flight instructor.

On the day preceding the accident, Edmundson told minor plaintiff that if she came to the airport on the following morning he would take her up with him on the preliminary flight, which was made each day for the purpose of observing weather conditions in the air. In accordance with this instruction minor plaintiff arrived at the airport on the morning of March 31, 1948,

at about 9:30 a.m. and a little in advance of the arrival of defendant, Edmundson. The weather conditions were unfavorable. In the words of minor plaintiff:

"The weather wasn't such a clear day, it was cloudy and looked like it was going to burst out raining any minute, and the wind was blowing hard; when I got off the back it hit me a good bit. It was a bad day, it was very stormy."

Minor plaintiff then at the invitation of defendant Edmundson went up with him in a training plane known as an Ercoupe. In describing what took place in the air minor plaintiff, in answer to her counsel, said:

"Q. Mary, did you take off?

"A. I didn't take off; my instructor did.

"Q. And the plane went up in the air?

"A. Yes.

"Q. What happened while you were up?

"A. Well, we rode around for a few minutes and it started raining, and the wind was blowing so much, the plane was tilting and rocking, like back and forth.

"Q. And then what happened?

"A. My instructor told me he thought it would be better to go down and land, it was so bad. We were in such a light plane, it wouldn't make it with the wind blowing like that; and he decided we better land.

"Q. Did you land?

"A. Yes.

"Q. Did anything occur as you were landing, or after you landed?

"A. Yes. We had difficulty landing.

"Q. Why did you have difficulty landing?

"A. The wind was blowing so much, it was like a gale.

"Q. What happened then?

"A. We landed, and we were on the runway going down, *and he told me he thought it would be best whenever we got near the office for me to get out, and go in there and wait for him.* . . .

"Q. Did the plane stop?

"A. Yes, the plane stopped on the ground.

"Q. Where did it stop?

"A. We were near the office.

"Q. I show you plaintiffs' exhibit 3 and ask you what that is?

"A. That is the office, right there (indicating).

"Q. A picture of the office, is it?

"A. Uh-huh.

"Q. And that is the office you refer to in your testimony?

"A. Yes.

"Q. Now, Mary, after the plane stopped what happened?

"A. *He told me to get out.*

"Q. And what did you do?

"A. I told him I would.

"Q. What did you do?

"A. After I unfastened my safety belt I stepped on the seat and out on to the wing.

"Q. As you got out of the plane, Mary,—to get out of this type of airplane, how do you get out?

"A. You have to step on the seat; there is no door.
. . .

"Q. Is that the proper and usual manner of getting in and out of these airplanes?

"A. Yes.

"Q. Is there any other way of getting out?

"A. There is no other way.

"Q. Did anything happen as you were getting out of that airplane?

"A. Yes; I was standing, holding on and the wind was blowing so much I thought I would fall.

"Q. Tell the jury what happened to you as you got out of the airplane?

"A. *I was holding on the two ends of that canopy, and I stepped out, standing there ready to turn, and the wind blew and the plane up-tilted so badly it loosened my hold, and I remember I fell forwards and my feet hit the ground.*

By the court:

"Q. Will you tell that again, I have difficulty hearing you.

"A. *As I stepped on the wing I had hold of the two edges of the canopy, and the wind was blowing toward the direction in which I thought I would fall; and as I was ready to turn, when turning, it blew so hard I lost my balance and I realized I was falling; and I fell forwards, my feet hit the ground, and that was all. . . . .*

"Q. At the time the plane came to a stop was the propeller or not revolving?

"A. Yes, it was revolving. . . .

"Q. Calling your attention to this wind you have described, was it more severe at the time you landed, or not more severe, than at the time you took off?

"A. Yes.

"Q. Did you notice the effect of the wind on anything else as you landed?

"A. Yes. It was tilting the planes up, as to those that were tied down.

"Q. What planes were tilting up?

"A. Some planes tied down right behind the office, in the rear; and they were flying up; and there was another one by the gas pump, and it was tilting up; and that was tied down too.

"Q. By 'tilting up' what do you mean?

"A. I mean the wings were going up and down." (Italics supplied.)

In her account of the accident, minor plaintiff was corroborated in several respects by another flying stu-

dent, who was nearby at the time of the accident and was called as one of plaintiffs' witnesses. The student flier, Paul Neligh, to whom we have referred, said that "it was a bad day for flying", and that when defendant Edmundson arrived he came over and said "Come on, Mary, come on up with me and we will check the weather".

"Q. And did anything happen while they were in the air?

"A. I noticed the plane was rocking quite a bit in the air.

"Q. The plane in which they were flying?

"A. Yes.

"Q. Did anything happen on the ground?

"A. At the time they were up in the air a big gust came up and lifted this plane up, by the pumps.

(The witness in the last statement was referring to another plane called a Piper Cub.)

"Q. A big gust of what?

"A. Wind.

"Q. Had the wind been blowing before?

"A. Yes, there was considerable strong wind.

"Q. By that I mean before they had taken off?

"A. Yes, there was very much strong wind.

"Q. This gust of wind you say came up, and what did it do to the Piper Cub?

"A. Lifted the Piper Cub up, and tilted it over on its one wing."

Again referring to the effect of the wind on the Piper Cub plane he said:

"A. It lifted the plane up on one wing, slanted it sort of sideways like it was held down on one side, and the other side clear up in the air. One side was down on the ground; tilted down to the ground. . . .

"Q. During all this time, will you describe to the jury what the weather conditions were as you held this plane?

"A. The wind continued blowing hard, it was a very windy day, and planes titled on their wings, it was blowing just all over the field, and shaking planes around. *At the time they were up in the air this particularly strong gust of wind came up and started shaking the planes around, it lifted this one plane up and drew my attention, and I went over and grabbed hold of it. . . .*

"Q. Now, Paul, did you or did you not see the plane in which Mary was a passenger, being operated by Edmundson, come to a stop?

"A. Yes, I did.

"Q. Did it stop?

"A. Yes, it did.

"Q. Did you observe anything with reference to whether or not after the plane came to a stop the propeller continued to operate under the power of the engine?

(An objection was made and overruled.)

"A. Yes, the propeller was still running.

"Q. Although the plane was stopped?

"A. The plane was stopped but the propeller was running.

"Q. Did you observe at this time anything with reference to the occupants of the Ercoupe, either Edmundson or Mary?

"A. What they were doing?

"Q. Yes.

"A. When the plane came to a stop after it crossed back of the plane I was holding?

"Q. What did you see at that time?

"A. As I was holding the plane down and this other plane crossed back of it I seen Mary stand up in the cockpit of this plane. Then I didn't notice it any more until I heard Claud Edmundson say, *'Mary, look out for the prop', and at that time she was down at the*

*front of the plane, between the propeller and the wing,*
*on the ground.*

"Q. At the time you heard Edmundson say, 'Mary, look out for the prop', what were weather conditions?

"A. It was still very rough." (Italics supplied.)

When asked what he did immediately after the accident, he said:

"A. Well, I went over to the plane and cut the switch off, or the 'mag', which was still on; and observed the canopy was open.

"Q. At the time you went over the 'mag' was still on?

"A. Yes."

Since Edmundson was the flying instructor employed by corporation defendant, if plaintiff's testimony was believed by the jury, negligence on the part of defendants might reasonably be inferred when Edmundson instructed her to get out of the plane under the weather conditions which were prevailing at the time and when the propeller was still revolving.

The remaining question is—whether the trial judge would have been justified as a matter of law in holding that minor plaintiff was guilty of contributory negligence.

As to this point we must bear in mind what our appellate courts have repeatedly declared that:

"Contributory negligence may be declared judicially only when so clearly revealed that fair and reasonable persons cannot disagree as to its existence: Cf. Carden v. Philadelphia Transportation Company, supra, p. 409." The above quotation is from O'Connor v. Philadelphia Suburban Transportation Company, 362 Pa. 404, 407.

In addition to the account of the accident given by minor plaintiff and her supporting witness, defendant flying instructor Edmundson testified in detail regard-

ing the construction and measurements of the Ercoupe plane, which was in use at the time of the accident. On the top of the wing there was a walk called the "catwalk"; "where you walk to get in or out". It contained in plain letters "No step. Beware Propeller".

Edmundson, when asked as to whether minor plaintiff, Mary, was familiar with the plane, said:

"Yes, and instructed as to the main points in operating any plane, and one of the important standard instructions you follow, to warn about the propeller and the main thing is not to walk back into it."

He also said on the panel there is printed "Leave Air Plane from Rear of Wing".

"Q. And when up in the air and you were flying she would have her hands on the wheel to get the feel, with you having control?

"A. Yes; and under certain conditions my hands were not holding the wheel.

"Q. Did she get to the point you let her fly without you having your hands on the steering at all?

"A. Yes. Mary was making good progress and I believe she would have soloed in another week."

In explaining the preliminary flight which was made each morning he said:

"A. Every morning the first flight is a weather flight, to check general conditions. I always made that flight in the morning before beginning flight instructions and on this occasion I combined them.

"Q. What did you do on this date?

"A. I was going to make the weather flight and ask Mary—I took for granted she came to take flight instructions as we talked about the night before; and I said, 'Come on, Mary, we will take the Ercoupe out—'

"Q. What were weather conditions on the ground at that time?

"A. Weather conditions—according to the sock the

wind was blowing off 70 degrees west, and I judged it to be 10 to 12 miles an hour—".

A little later regarding the weather he said:

"A. It was what I would say a little rough in the air, with a 10-to 12-mile wind blowing, and it would change; the moving air struck the plane on the windward side and then on the leeward side, like you have varying conditions on the ground. It was a little rough but not dangerous; it was a little gusty but not unusually gusty."

Another witness for defendants, Walter C. Schmidt, a contractor, who was engaged in work at the airport, in describing the operation of the Ercoupe plane immediately before the accident, said:

"A. Well, the way it appeared to me, the plane was coming almost directly towards where we were, coming by the gas tank there. And the plane appeared to me to stop, and the young lady came through the top of the plane, out onto the wing, and off the wing to her left *and threw up her arms, and the propeller knocked her down to her right*."

There was evidence from which the jury might conclude that the young plaintiff, Mary Papoulas, was thrown off her balance by a sudden gust of wind as she was getting out of the airplane and fell forward and was struck by the propeller and that the accident did not happen from any disregard on her part of the instructions regarding alighting from the airplane. The young girl said that she was holding on with both hands and that the tilting of the plane and the wind loosened her hold. It must be assumed, of course, that a girl of her intelligence was quite aware of the danger of coming in contact with a revolving propeller.

The jury had a right also to assume, we think, that instruction in piloting an airplane was a training that was not free from danger. The jury was adequately instructed regarding contributory negligence. Since

they were unable to agree they apparently were divided on that question. Was she justified in following the instructions of Edmundson? This we think was a question for the jury. It seems to us that we cannot hold as a matter of law that minor plaintiff was guilty of contributory negligence.

Defendants' motion for judgment on the record must, therefore, be refused.